UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff,<br><br>against<br><br>WG TRADING INVESTORS, L.P., WG TRADING COMPANY, LIMITED PARTNERSHIP, WESTRIDGE CAPITAL MANAGEMENT, INC., PAUL GREENWOOD and STEPHEN WALSH, Defendants,<br><br>and<br><br>ROBIN GREENWOOD and JANET WALSH, Relief Defendants. | Civ. No. 09cv1750(GBD) |
| COMMODITY FUTURES TRADING COMMISSION, Plaintiff,<br><br>against<br><br>STEPHEN WALSH, PAUL GREENWOOD, WESTRIDGE CAPITAL MANAGEMENT, INC., WG TRADING INVESTORS, L.P. and WGIA, LLC, Defendants,<br><br>against<br><br>WESTRIDGE CAPITAL MANAGEMENT ENHANCEMENT FUNDS, INC., WG TRADING COMPANY, L.P., WGI LLC, K&L INVESTMENTS and JANET WALSH, Relief Defendants. | Civ. No. 09cv1749(GBD) |

**JOINT SUBMISSION OF INFORMATION BY SEVEN WG TRADING COMPANY, L.P. LIMITED PARTNERS**

The undersigned limited partners of WG Trading Company Limited Partnership ("WGTC") respectfully submit this Joint Submission pursuant to the Court's oral order on May 19, 2009 and the Receiver's Notice to Proposed Intervenors of Briefing Schedule of May 22, 2009. The undersigned seven WGTC limited partners ("Seven WGTC LPs") are all fiduciaries

harmed by, and unrelated to, the defendants. The Seven WGTC LPs hold 13 of the 15 limited partnership interests in WGTC, with three of the seven acting on behalf of more than one related entity, each of which holds a separate limited partnership interest, as reflected in Tab 11 to the Report of Temporary Receiver's Activities for the Period From February 25, 2009 Through May 22, 2009 ("Report").[1]

## PRELIMINARY STATEMENT

The Seven WGTC LPs appreciate the diligence of the Receiver's investigation into the activities of Messrs. Walsh and Greenwood and look forward to continuing to work cooperatively with the Receiver to further its analysis. Even at this preliminary stage, however, the Seven WGTC LPs submit that the Report supports the conclusion that the assets of WGTC recovered and preserved by the Receiver should ultimately be distributed to them in accordance with their capital accounts at WGTC. The Report suggests that their capital accounts remained intact at WGTC at the time the Receiver assumed control over that entity. The Seven WGTC LPs thus believe that it would be a miscarriage of justice if the assets they invested in the regulated, audited WGTC partnership were diverted in this receivership to others who chose to invest their funds in, or loan their funds to, other entities that they knew were neither regulated nor audited, regardless of the theory employed to consolidate these separate entities.

Since the Court's Order and the Receiver's Notice invited solely the submission of information at this time, not legal argument, the Seven WGTC LPs do not press those arguments here, but rather look forward to the opportunity to continue to work with the Receiver informally

---

[1] This submission is not made on behalf of the remaining two limited partners of WGTC (believed to be WGIA, LLC and James Carder). WGIA, LLC is a defendant in the above-captioned CFTC action, but on information and belief is a special purpose entity created for an investor in WGTC that is not controlled by or affiliated with Defendants Walsh and Greenwood. Mr. Carder formed Defendant Westridge Capital Management, Inc. ("Westridge") with Defendants Walsh and Greenwood and served as a senior officer of Westridge until the commencement of the above captioned actions.

and as a group to explore the facts before framing definitive arguments. They note, however, that based on the information developed to date, there are compelling factual and legal arguments that WGTC's assets should not be pooled with those of other entities, and they intend to make such arguments at the appropriate time. Until the Court adopts a plan of distribution following notice and hearing, the Seven WGTC LPs request that the Receiver continue to preserve the assets of WGTC and protect them from dissipation or distribution.

The Receiver's May 22 Notice required submissions of information by June 1 by any "proposed intervenors" who contend that "funds in which they claim an interest are not part of, or subject to, the pending receivership estate previously established by the Court and therefore should not be administered by the Receiver." While one of the Seven WGTC LPs unsuccessfully sought to intervene in these actions, none of the Seven WGTC LPs is currently an "intervenor." Moreover, at this stage and based on the limited available evidence, none of the Seven WGTC LPs contends that the assets of WGTC are not subject to the jurisdiction of the Receiver or of the Court. Accordingly, no submission is strictly speaking required at this time from the Seven WGTC LPs.[2]

Nonetheless, the Seven WGTC LPs make this submission as a precaution since the Receiver holds approximately $550 million in WGTC assets allocable to them. As discussed below, the Seven WGTC LPs believe that such assets represent legitimate investments in WGTC, not the fruits of the fraud Messrs. Walsh and Greenwood allegedly committed, and that such assets are not otherwise tainted. To the contrary, the investment program offered and executed by WGTC during the periods the Seven WGTC LPs invested in WGTC was a legitimate strategy that did not reflect or depend upon any fraudulent scheme.

---

[2]   Moreover, on May 28, 2009, the Receiver informed a representative of the Seven WGTC LPs that the Receiver would seek Court approval for a procedure allowing the Seven WGTC LPs another opportunity to discuss the distribution process before the Receiver makes a distribution recommendation to the Court.

The conclusion to be drawn from the Receiver's Report is that to the extent any fraud took place involving WGTC, the Seven WGTC LPs were its victims: Walsh and Greenwood diverted the limited partners' capital for unauthorized purposes for the benefit of themselves and investors of their other entities, and may also have under-allocated WGTC's legitimately earned revenue when making distributions to its limited partners.

As the Receiver's Report shows, the primary fraud allegedly perpetrated by Walsh and Greenwood in no way increased the capital accounts of the Seven WGTC LPs. By their separate actions, Walsh and Greenwood apparently obtained (and misappropriated) assets from other investors for a non-WGTC entity that was allegedly to act in effect as a "feeder" to WGTC, WG Trading Investors Limited Partnership ("WGTI"). Apparently, the misappropriation of those unrelated assets occurred at WGTI, not at WGTC. The fact that defendants Walsh and Greenwood led WGTI investors to believe their funds would be invested in WGTC does not change this reality.

The Receiver's Report identifies no more than a handful of discrete instances over a period of more than ten years in which WGTI assets (other than those funds formally invested in WGTC) may have been provided to WGTC. Although more information may be useful to evaluate the significance of those transactions, taken either individually or collectively, the Report does not support a conclusion that the funds of WGTC were ever meaningfully commingled with those of WGTI or any other entity — or that such funds should be pooled or consolidated with those of any other Walsh and Greenwood entities. On the contrary, based upon the Receiver's Report, it appears that these discrete transactions were temporary deposits: With a single exception over ten years ago prior to the initial WGTC investment by any of the Seven WGTC LPs, the Receiver's Report appears to indicate that each WGTI deposit that found its way to WGTC was associated with withdrawals or offsets in amounts that either equaled or

exceeded the transfers to WGTC over the same period. Thus, such transactions led to a net *outflow* of funds from WGTC, a fact that suggests that the Seven WGTC LPs did not benefit from such transactions and may have a claim to recoveries from third parties. This fact seriously undercuts any view that creditors or investors in other entities have any claims to the assets invested by the Seven WGTC LPs in a regulated entity.

The Seven WGTC LPs also make this submission to provide the Receiver with information demonstrating how differently situated they are from the unsecured creditors of Defendant WGTI. As the Receiver's Report recognizes, the Seven WGTC LPs made their investments directly in WGTC, a highly-regulated entity, on the basis of audited financial statements for WGTC provided by Deloitte & Touche that confirmed the integrity of their investments. Others mentioned in the Report transferred their funds (typically as loans not equity investments) in the first instance to other, non-WGTC defendant entities that they knew were neither regulated nor audited, and from which their funds were apparently misappropriated. Additional facts, some of which warrant fuller development, compel the conclusion that the Seven WGTC LPs are entitled to the recover their allocable shares of WGTC assets on the basis of their respective capital accounts in WGTC.

Finally, the Seven WGTC LPs submit that they are entitled to an opportunity to be heard further in advance of the Receiver's formulation and the Court's adoption of any plan of distribution. The Seven WGTC LPs look forward to continuing to work with the Receiver to discuss its plan of distribution before it is presented to the Court.

The current limited partners of WGTC who jointly make this Statement are identified, in alphabetical order, in Appendix A.

## SUBMISSION OF INFORMATION

1. **Seven WGTC LPs Own Direct Interests in WGTC, Which the Receiver Found to be Intact.** The Seven WGTC LPs each invested funds into WGTC and received in return one or more limited partnership interests in WGTC[3] and a right to the assets allocable to their respective capital accounts upon termination of the partnership. WGTC Partnership Agreement § 15.2.6. The Seven WGTC LPs believe, and the Receiver's Report appears to confirm, that the funds the Seven WGTC LPs paid for their limited partnership interests in WGTC were invested (with only a small number of temporary exceptions) in WGTC and used to execute a legitimate investment strategy. As of January 31, 2009, the Seven WGTC LPs' limited partnership interests were valued at approximately $550 million, as confirmed by the Receiver. (Report at Tab 11). The Receiver apparently found those limited partner capital accounts to be intact at the time he assumed control over WGTC. Having liquidated the investment portfolio, there are sufficient assets held at WGTC to return to the Seven WGTC LPs their respective capital accounts in full.

2. **There are No Allegations That Any of the Seven WGTC LPs Procured Their Limited Partnership Interests Improperly; the Alleged Wrongful Conduct Primarily Involved Other Westridge Entities.** WGTC is an entity distinct from the other defendants and primarily owned by the Seven WGTC LPs who are unrelated to the defendants. The Seven WGTC LPs obtained their limited partnership interests in WGTC legally, and there have been no allegations that the assets of WGTC seized by the Receiver were not then being invested in the manner represented. While in a few instances over the course of a decade there appear to have been outflows of capital from WGTC to WGTI, the Receiver's Report confirms that WGTC was not itself a Ponzi scheme, and with only a handful of exceptions, the funds the Seven WGTC LPs invested were applied for the legitimate investment purpose promoted to them. There were

---

[3] As noted above and in Appendix A, three of the Seven WGTC LPs make this submission on behalf of two or more discrete funds or affiliated entities.

apparently hundreds of millions of dollars of misappropriated investor funds. However, according to the complaints of the federal agencies and the Receiver's Report, the misappropriation and fraudulent conduct almost excusively involved the funds invested in WGTI, not WGTC.

As reflected in the Receiver's Report, WGTC managed an enhanced index arbitrage trading strategy, under which S&P 500 or other futures as well as the underlying equities in the index were traded in arbitrage transactions that were designed to take advantage of the pricing differences between such related instruments over a stated period of time. The Receiver's Report and the Complaints in the above-captioned actions do not allege that there is anything fraudulent about this enhanced arbitrage trading strategy or the investment operations conducted at WGTC. Rather, the alleged fraud consisted of *the failure of the other named Defendants to invest funds received from other investors in WGTC as promised.*

> Rather than "fully" investing the 85% investor assets in WGTC for use in the index arbitrage trading strategy, as represented, Walsh and Greenwood invested a mere fraction of this money in WGTC and simply misappropriated the rest to pay for their lavish and luxurious lifestyles.

(SEC Compl. at ¶ 28.) Indeed, the SEC alleges that "[o]f the $667 million Westridge clients invested in WGTI, Greenwood and Walsh misappropriated as much of $554 million…" (*Id.* at ¶ 2). It is noteworthy that this allegation suggests that virtually all of the fraud that the Receiver's Report estimates had a current value of approximately $600 million (Report at 2) took place within WGTI.

The CFTC Complaint does not allege, even in conclusory fashion, that unlawful activity occurred at WGTC. Although the complaint refers conclusorily to a common strategy and fraudulent activity in all investment vehicles, the specific allegations of misappropriation are linked to the investments in WGTI and evidenced by the promissory notes WGTI provided:

> Following the misappropriation of pool participants' funds through WG Trading Investors, Greenwood and Walsh manufactured paperwork in the form of promissory notes in order to present the appearance that the pool participants funds had been loaned to them.
>
> Greenwood and Walsh failed to disclose to the pool participants that (a) they did not intend to and in fact did not invest participants' funds as they represented orally and in writing to participants, and (b) they were misappropriating participants funds for personal use and to conceal trading losses.

(CFTC Complaint ¶¶ 41–42). Indeed, the Receiver found in its Report that Greenwood and Walsh owed WGTI approximately $553 million (Report at 14), and concluded that "[t]he Operations of WGTI had the Elements of a Classic Ponzi Scheme" (Report at 24). The Receiver did not reach such a conclusion about WGTC.

3. **Any Alleged Improper Conduct Involving WGTC Decreased Rather Than Increased WGTC's Assets.** While the Seven WGTC LPs have not yet had an adequate opportunity to analyze fully the Report, it seems to indicate that to the extent Walsh and Greenwood used WGTC and its assets improperly, their improper activities resulted in *a net outflow of funds from WGTC, rather than a net inflow to WGTC*. Therefore, WGTC's current assets do not appear to include any "ill gotten gains."

Any funds Walsh and Greenwood improperly took from WGTC do not taint WGTC's remaining assets, they merely diminish them. While the Receiver is charged with determining the disposition, return, and equitable distribution of improperly obtained assets, the Receiver cannot redistribute legitimate, untainted assets that are distributable to persons other than the alleged perpetrators, particularly here where those entitled to such distributions are themselves fiduciaries and victims of the improper conduct.[4]

---

[4] This is especially true here, where the limited partnership interests in WGTC are protected from being provided to anyone other than the participants or other beneficiaries of their plans or programs. For the funds invested by the Blue Cross Blue Shield and 3M related LPs (Appendix A No. 1 & 7), ERISA affords this protection by impressing ERISA plan assets treatment upon the underlying assets of WGTC because more than 25 percent of WGTC assets

4.  **Separate Maintenance of WGTC Assets is Appropriate Since the Seven WGTC LPs are Very Differently Situated From Other Westridge Investors.** As noted above, the primary misconduct alleged in the government complaints and in the Receiver's Report is that monies loaned by investors to WGTI, a Walsh and Greenwood entity that was supposed to invest in WGTC, were improperly taken by Walsh and Greenwood. The investors in WGTI, who apparently have suffered significant losses, are very differently situated from the Seven WGTC LPs. Unlike the Seven WGTC LPs, they did not obtain any equity interest in WGTC, or even in WGTI, but merely received an unsecured WGTI note promising repayment of a loan. Rather than investing directly in WGTC, the WGTI investors relied on promises that their funds would be invested in WGTC, even as Walsh and Greenwood apparently took for themselves much of those monies rather than invest them in WGTC. By contrast, there have been no allegations that WGTC did not execute the arbitrage strategy that was promoted to the Seven WGTC LPs. The Receiver's Report confirms that WGTC held substantial assets that it had invested in such strategy, substantially as promised. WGTC, unlike WGTI, was regulated by the SEC, FINRA, CFTC, NFA and the DOL and the subject of regular independent audits by Deloitte & Touche. Indeed, these differences were the very reason, among others,[5] that the Seven WGTC LPs chose to invest directly in WGTC rather than indirectly through WGTI.

---

are held for employee benefit plans. 29 CFR §2510.3-101(non-ERISA plans are counted for this 25 percent test); *Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*, 2008 U.S.Dist. LEXIS 25740, *51-*55 (SD Fla. 2008).

   For other limited partners making this submission, such protection may derive from applicable state trust laws based on the common law, from protections afforded limited partners that are not applicable to unsecured creditors of a limited partnership, and/or provisions of state law analogous to ERISA. For example, two of the Seven WGTC LPs are California governmental entities subject to standards and protections very similar to those provided by ERISA. See California Constitution, Article XVI, section 17.

[5]   For example, in addition to its preference for a direct investment in a Delaware limited partnership, at least one of the Seven WGTC LPs concluded that due to the affiliation between Westridge and WGTI, an investment in a WGTI note would constitute a prohibited transaction

It would be inequitable to the Seven WGTC LPs to disregard WGTC as a separate entity and distribute its assets to investors in other entities. Such distribution, whether achieved through consolidation, veil piercing, or some other mechanism, may be improper under federal or Delaware law.[6] To the best of the Seven WGTC LPs' knowledge, WGTC has operated at all times as a legal entity separate and distinct from its affiliates. The rarely invoked artifice of disregarding an entity's separate legal existence is designed to recover assets from a bad actor, not to harm innocent investors by pooling affiliates' assets when liquidating a family of entities.

5.  **The Seven WGTC LPs' Assets Should Be Returned As Soon As Possible So They Can Be Reinvested for the Benefit of Others.** The portion of the WGTC assets allocable to the limited partnership interests of the Seven WGTC LPs should be distributed to their rightful owners as soon as possible. The Seven WGTC LPs understand that limited partners related to Walsh and Greenwood or one of their entities may own a portion of the remaining interest in WGTC. The Seven WGTC LPs do not ask that such portion of WGTC be distributed to them, but that the WGTC assets allocable to their respective capital accounts be distributed to them, and that to facilitate the eventual return of those assets, the Receiver maintain separate accounting for all WGTC assets.

---

under ERISA section 408(a)(1)(B) and IRC section 4975(c)(1)(B), and income on the note could constitute debt financed income taxable as unrelated taxable income.

[6]  As to federal law, see note 4 above. As to Delaware law, a Delaware limited partnership is a separate legal entity until its termination. DRULPA § 17-201(b). A Delaware court would disregard the separate status of affiliated entities only if the court found that exceptional circumstances require piercing the veil and treating affiliates as one consolidated entity. *See, e.g., Sears Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1305 (D. Del. 1990) ("It is only the exceptional case where a court will disregard the corporate form."). Common ownership or management is not sufficient cause to set aside the separate existence of Delaware entities. *Trustees of the Village of Arden v. Unity Construction Co.*, 2000 Del. Ch. LEXIS 7 at *12 (Del. Ch. Jan. 26, 2000). The standard for veil piercing under Delaware law requires a showing that one entity controls another entity to the extent that such control is "exclusive domination and control . . . to the point that [one entity] no longer has legal or independent significance of [its] own." *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, 1992 Del. Ch. LEXIS 112, at *5 (Del. Ch. May 28, 1992). Such a strong showing has not been established thus far in this case.

The Seven WGTC LPs are entitled to receive their share of the untainted money remaining in WGTC so that they can reinvest it to provide funds for their participants and beneficiaries, including retirees, employees and their families, students, and settlement trust beneficiaries. With the value of their respective capital accounts in WGTC frozen in short term investments bearing the costs of receivership, the income security, health and other welfare benefit security, and other non-profit objectives served by the Seven WGTC LPs' plans and programs are being compromised as long as the WGTC assets remain inaccessible.

## CONCLUSION

The Seven WGTC LPs believe that justice would be miscarried were any part of their capital accounts in the regulated, audited WGTC partnership, and which remained intact at the time of the Receiver's appointment, shared with others who chose to invest their funds in other entities that they knew were neither regulated nor audited. The Seven WGTC LPs recognize it is premature to make definitive arguments about the eventual plan of distribution, given their lack of access to all the relevant information and the preliminary nature of the Receiver's Report. However, the Seven WGTC LPs submit that WGTC's assets should not be pooled with those of other entities on any theory, as they will demonstrate, based on the facts and the law at the appropriate time. In the interim, the Seven WGTC LPs seek to continue to work with the Receiver, informally and as a consolidated group as appropriate, to explore the facts that bear on this issue.

Respectfully submitted:

For   Blue Cross and Blue Shield Association National Retirement Trust

Carole Neville
cneville@sonnenschein.com
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020-1089
Direct: 212.768.6889

Office: 212.768.6700
Fax: 212.768.6800

appearance filed with this submission (admitted SDNY)

Alan S. Gilbert
*agilbert@sonnenschein.com*
Sonnenschein Nath & Rosenthal LLP
7800 Sears Tower
233 S. Wacker Drive
Chicago, IL 60606
Direct: 312-876-7410
Office: 312-876-8000
Fax: 312-876-7934

appearance filed with this submission

For    Alexander Dawson Foundation &
       Alexander Dawson, Inc.

Joel Blanchet
*jblanchet@kirkland.com*
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Tel. (212) 446-4993
Fax (212) 446-4900

appearance already on file (admitted SDNY)

Maria Ginzburg
*maria.ginzburg@kirkland.com*
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Tel. (212) 446-4993
Fax (212) 446-4900

appearance already on file (admitted SDNY)

For:   Kaiser Aluminum & Chemical Corporation Asbestos Personal Injury Trust

Frances Gecker
*fgecker@fgllp.com*
Frank/Gecker LLP
325 North LaSalle Street
Suite 625

Chicago, IL 60654
312-276-1401 (direct)
312-276-1400 (main)
312-276-0035 (fax)

appearance to be filed

Joseph D. Frank
*jfrank@fgllp.com*
Frank/Gecker LLP
325 North LaSalle Street
Suite 625
Chicago, IL 60654
312-276-1402 (direct)
312-276-1400 (main)
312-276-0035 (fax)

appearance to be filed

For: North Dakota State Investment Board

John C. Blessington
*john.blessington@klgates.com* &
Michael D. Ricciuti
*michael.ricciuti@klgates.com*
Robert W. Sparkes, III
*Robert.sparkes@klgates.com*
Special Assistant Attorneys General
State Street Financial Center
One Lincoln Street
Boston, MA 02110
617-261-3100 (T)
617-261-3175 (F)

Pro hac vice motion to be filed

Sarah P. Kenney
*sarah.kenney@klgates.com*
K&L Gates LLP
599 Lexington Avenue
New York, New York 10022
Tel 212.536.4880
Fax 212.536.3901

appearance filed with this submission (admitted SDNY)

For: Sacramento County Employees' Retirement System

John C. Blessington
*john.blessington@klgates.com* &
Michael D. Ricciuti
*michael.ricciuti@klgates.com*
Robert W. Sparkes, III
*Robert.sparkes@klgates.com*
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02110
617-261-3100 (T)
617-261-3175 (F)

Pro hac vice motion to be filed

Sarah P. Kenney
*sarah.kenney@klgates.com*
K&L Gates LLP
599 Lexington Avenue
New York, New York 10022
Tel 212.536.4880
Fax 212.536.3901

appearance filed with this submission (admitted SDNY)

For:   San Diego County Employees Retirement Association

Ames Davis
*adavis@wallerlaw.com*
Waller, Lansden, Dortch & Davis
Nashville City Center
511 Union Street
Suite 2100
Nashville, TN 37219
(615) 244-6380
Fax: (615) 244-6804

appearance already on file (admitted Pro Hac Vice)

Jennifer Weaver
*jennifer.weaver@wallerlaw.com*
Waller, Lansden, Dortch & Davis
Nashville City Center
511 Union Street
Suite 2100
Nashville, TN 37219
(615) 244-6380

Fax: (615) 244-6804

appearance already on file (admitted Pro Hac Vice)

For 3 M Employee Welfare Benefit Association Trust I,
3 M Employee Welfare Benefit Association Trust II &
3 M Employee Welfare Benefit Association Trust IIII &
Minnesota Mining And Manufacturing Employee Retirement Income Plan Trust,

        Richard F. Ziegler
        *rziegler@jenner.com*
        Jenner & Block LLP
        919 Third Avenue
        37th Floor
        New York, NY 10022-3908
        Tel (212) 891-1680
        Fax (212) 909-0854

appearance already on file (admitted SDNY)

        David Newman
        *dnewman@jenner.com*
        Jenner & Block LLP
        919 Third Avenue
        37th Floor
        New York, NY 10022-3908
        Tel (212) 891-1684
        Fax (212) 909-0866

appearance already on file (admitted SDNY)

## Appendix A: Identification of the Seven WGTC LPs

1. **The Blue Cross Blue Shield National Retirement Trust** is a tax qualified pension trust that invests assets subject to the protections of Employee Retirement Income Security Act of 1974 ("ERISA") for the benefit of employees employed by 23 Blue Cross and Blue Shield Plans around the country.

2. **Alexander Dawson Foundation ("ADF")** is a Nevada charitable trust that supports the Alexander Dawson schools in Nevada (pre-K to 8th grade) and Colorado (pre-K to 12th grade), serving the needs of over 1,000 students. Alexander Dawson, Inc. ("ADI"), a Nevada corporation wholly owned by ADF, serves as an investment arm to ADF.[1]

3. **The Kaiser Aluminum & Chemical Corporation Asbestos Personal Injury Trust** is a Delaware statutory trust established as a qualified settlement fund on July 6, 2006 in accordance with the Second Amended Joint Plan of Reorganization of Kaiser Aluminum Corporation, Kaiser Aluminum & Chemical Corporation and Certain of Their Debtor Affiliates and confirmed by an order of the United States District Court for the District of Delaware on May 11, 2006. The purpose of the trust is to pay all present and future asbestos personal injury claims of Kaiser Aluminum & Chemical Corporation which have been channeled to the trust.

4. **North Dakota State Investment Board ("NDSIB")**, as established under the provisions of Chapter 21-10 of the North Dakota Century Code, has statutory responsibility for the administration (including investment services and management) of the investment programs of North Dakota state retirement systems, funds and benefits plans. The funds over which NDSIB has such administrative responsibility include the North Dakota Public Employees Retirement System, the North Dakota Teachers' Fund for Retirement, the North Dakota Workforce Safety & Insurance Fund, and the North Dakota State Bonding Fund.[2]

5. **Sacramento County Employees' Retirement System ("SCERS")** is an independent public defined benefit retirement system established and administered under the provisions of the County Employees Retirement Law of 1937, California Government Code section 31450, et seq. SCERS is charged by the above-referenced statute with collecting and investing contributions from public employees and employers for the purpose of distributing retirement and associated benefits for eligible public employees and retirees of Sacramento County, California and other participating public employers.

---

[1] Although jointly represented and counted as one investor solely for purposes of this submission, ADF and ADI each hold a separate limited partnership interest in WGTC and is counted as two investors in Tab 11 to the Receiver's Report.

[2] Although counted as one investor solely for purposes of this submission, the NDSIB actually holds limited partnership interests for three separate accounts it manages and is counted as three investors in Tab 11 to the Receiver's Report.

6.  **San Diego County Employees Retirement Association ("SDCERA")** is an independent association formed and existing under the California's County Employees Retirement Law of 1937 (cited above). SDCERA was established by the adoption of an ordinance by the Board of Supervisors of the County of San Diego. SDCERA is charged by statute with collecting, investing and distributing retirement and associated benefits for eligible employees and retirees of San Diego County, California and other participating employers.

7.  **The 3M ERISA Plans ("3M")** comprise four separate entities,[3] each governed by ERISA and administered for the benefit of retirees and current employees in the United States of the 3M Company, a multi-national diversified technology company headquartered in St. Paul, Minnesota. The 3M Employee Retirement Income Plan is a defined benefit pension plan with assets held in a separate trust, and the 3M Employees Welfare Benefits Association Trusts I, II and III fund the payment of various medical, disability and life insurance through employee welfare benefit plans governed by ERISA. The Bank of New York Mellon serves as trustee of all four trusts.

---

[3] Although jointly represented and counted as one investor solely for purposes of this submission, each of the four 3M ERISA Plans holds a limited partnership interest in WGTC and is counted as a separate investor in Tab 11 to the Receiver's Report.